UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:22cr227 (SVN) |
| | : | |
| v. | : | December 11, 2023 |
| | : | |
| MICHAEL LONSKI | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States submits this sentencing memorandum in anticipation of the sentencing of Michael Lonski, scheduled for December 18, 2023.

Michael Lonski has been engaged in rampant health care fraud for the better part of 20 years. He was sued by the U.S. Attorney's Office in the Southern District of New York in 2002 for false billings similar to the false claims here. After serving a five year exclusion from Medicare and Medicaid, and receiving his first second chance, Lonski responded by reverting to fraud. He was investigated by Medicare investigators and by Cigna fraud investigators and instead of coming clean, he disparaged his patients and manufactured medical records in order to avoid detection and keep his scheme going.

Lonski's fraudulent billings were not borne out of manic, chaotic behavior as he now claims. Rather, his pattern of fraud was deliberate, consistent and steadfast. During a six-year period from January 1, 2014 through December 31, 2019, Lonski claimed to have provided services every single day, including every Saturday, every Sunday, and every holiday, except for a single day in 2017. He submitted over 80,000 claims for service, a truly staggering volume, that may well have resulted in a higher calculated loss figure had Lonski not agreed to plead guilty early on in the case and halt the government's review of his submitted claims.

Lonski insists that through all of that false billing his patient care was always

"exemplary," but that is not consistent with the facts.  He did not bother keeping progress notes, an important (and required) record for a clinician to record events, opinions, treatment plans, to ensure quality care.  Lonski submitted claims treating people who were already deceased on purported treatment dates.  He submitted hundreds of claims for a patient's spouse whose dealings with him were for work on Lonski's website.  He engaged in gaslighting of one patient who questioned his billings, insisting that it was caused by a "technical problem" because "nobody in their right mind" would bill for that many sessions (and suggesting that the patient wasn't in hers for asking the question).

The duration and magnitude of Lonski's offense, when viewed against the backdrop of his history of health care fraud, shows an extraordinary lack of respect for the law, his patients, and his profession.  The Court should impose a sentence within the advisory Guidelines range commensurate with the seriousness of the offense, his personal history, and Lonski's decades of recidivist conduct.

## I.    FACTUAL BACKGROUND

### A.    Procedural History

On December 12, 2022, Lonski waived indictment and pled guilty to a one-count information charging him with health care fraud in violation of 18 U.S.C. § 1347. *See* Presentence Report ("PSR") at ¶ 1.

### B.    Offense Conduct and Relevant Conduct

As noted in paragraph 5 of the PSR, the Government submitted a Government's Version of Offense Conduct and supporting exhibits to Probation.  As is customary, the PSR sets forth the offense and relevant facts, but does not include exhibits.  In order to assist the Court, the Government submits and describes some of those exhibits with references to particular paragraphs and headings from the PSR, where appropriate.  The entire set of exhibits submitted

in support of the Government's Version of Offense Conduct is available to the Court upon request.

### Lonski's Prior Exclusion from Medicaid and Medicare (2003-2008)

PSR ¶ 7:  GX 1 (Complaint filed in *United States v. Michael Lonski*, Case No. 02 Civ 8690) showing that Lonski was sued by the U.S. Attorney's Office Southern District of New York for knowingly submitting recklessly false billings to Medicare that showed excessive numbers of services per patient, multiple visits by the same patient in a single day, and services rendered on an excessive number of days in a year.

PSR ¶ 7:  GX 2 (Settlement Agreement in 02civ8690) in which Lonski agreed to settle the complaint against him by, among other things, agreeing to pay the government $4,000,000 and to be excluded from participating in all federal health care programs.

### Scrutiny of Lonski's Medicare Claims by the Centers for Medicare & Medicaid Services (CMS) (2013 – 2014)

PSR ¶ 13:  GX 2 (Letter dated July 26, 2013 from the New England Benefit Integrity Support Center (NE BISC) placing Lonski on pre-payment review for "aberrancies" in billing.

PSR ¶ 13:  GX 3 (Letter dated December 13, 2013 from the NE BISC to Lonski) informing him that of 432 claims it reviewed, 407 were denied, 14 were approved, and 11 services were reduced.  *Id.*  Lonski claimed to have visited clients on all but four days during that period, averaging 9 patient visits per day.  *Id.*  The investigation found Lonski's progress notes lacking, containing "cloned documentation," reciting the patient's "pleasure" with Lonski's visits, rather than providing necessary detail, and concluded that the visits were "supportive in nature" rather than "being of medical necessity." *Id.* at 2.  Approximately 21 of the claims had overlapping times (by 7-55 minutes) and a few visits which were rendered in two different facilities (the shortest travel time between any of the three facilities at issue was at least 15

minutes) with only five minutes in between.

**Patient Complaints Prompt Medicare Investigation of Lonski's Overbilling (2014 - 2015)**

**Patient Raymond L.**

PSR ¶ 18:  GX 4 (1/26/15 Complaint  by Raymond L.) stating that Raymond L. did not receive services on four of the claimed dates of service and that he had "contacted doctor back in April of 2014 and was told by doctor that this would be corrected but it has not." GX 40 at 2.

PSR ¶ 19:  GX 5 (Letter dated 2/25/15 from the National Government Services, Screening Investigative Unit (NGS-SIU) to Lonski) informing Lonski that it was auditing Raymond L.'s claims and requesting supporting documentation.

PSR ¶ 20, 21:  GX 6 (3/28/15 response from Lonski to NGS-SIU) stating that most skilled nursing patients (including Raymond L.) refer to him as "Dr. Mike" without understanding that his last name was Lonski.  *Id.* at MEDICARE_30.  Lonski provided very detailed progress notes, including one that addressed the "Dr. Mike" issue specifically, stating that the patient knows "this clinician" as "Dr. Mike" and "never thought to ask last name as all residents refer to clinician this way patient states."  GX 6 at MEDICARE_59.

PSR ¶ 22:  GX 7 (Lonski's Database Record of Progress Notes) [1] showing that the progress notes Lonski submitted to NGS-SIU were manufactured after-the-fact.  Lonski's database records show that on March 22, 2015, ***after*** the NGS-SIU initiated its audit of those

---

[1] The government does not have the particular user interface that Lonski would have used to view the information in the database, so any information presented does not have the same "look and feel" as what he would have seen in real time. However, the database provides information for a particular appointment (which would correlate to a claim line provided by insurers) in a single row of an Excel spreadsheet. The printouts from that database presented here, are trimmed down to provide selected information such as the dates on which the entries were added or changed, patient name, date of service, and progress notes.

claims (on 2/25/15, PSR ¶ 19), Lonski altered progress notes for Raymond L., significantly

expanding them in length and detail, and then submitted the altered progress to NGS-SIU six

days later.  GX 5 at MEDICARE-49-61.

### Patient Robert F.

PSR ¶ 23:  GX 8 (2/13/15 Complaint (Patient Robert F.)) filed by Robert F.'s wife stating

that Lonski billed Robert F.'s Medicare for psychotherapy at Greenwich Hospital, that Robert F.

has never seen Dr. Lonski, and that Greenwich Hospital told her that Dr. Lonski was not even in

the hospital's records.

PSR ¶ 24:  GX 9 (Resolution of Robert F. Complaint) showing that the complaint against

Lonski regarding Robert F. was resolved because "Records verify the service billed."  *Id.* at

MEDICARE_131.

PSR ¶¶ 25-26:  GX 10 (Lonski's Database Record of Progress Notes) showing that the

resolution of Robert F.'s complaint was based upon progress notes Lonski made up after-the-fact

for the purpose of responding to the NGS-SIU inquiry.  Before the NGS-SIU initiated its

investigation (on February 13, 2015), the progress note for patient Robert F. for October 10,

2014 consisted of a single line:  "Patient continues to be anxious about his need for treatment at

this SNF but even more so about his recent CVA and debilitating illnesses."  GX 10.   There was

no mention that Robert F. was confused or suffering from memory loss.  On July 5, 2015, the

day before Lonski called the NGS-SIU to tell them that his records were mailed, Lonski created

a progress note for patient Robert F. that was five times longer than the original (and nine

months after the purported treatment date), adding in that the patient suffered from "confusion"

and "memory loss," was suffering a "current decline in functioning," and twice saying that, due

to these reasons, the patient "does not recall seeing clinician."  *Id.*

**Patient Complaint Prompts Cigna's Investigation of Lonski's Overbilling (2017 – 2019)**

PSR ¶ 29:  GX 11 (Text messages between Lonski, Liam B., Margarite E.) in which Margarite E. told Lonski she wanted to talk, and that her husband, Juan V.A., was "very upset." Lonski claimed that he "caught" a "billing error" and was also upset and wanted to talk.

PSR ¶¶ 30-31:  GX 12 (2/7/19 Email chain from Juan V.A. to Lonski) repeatedly asking for (and not receiving from Lonski) copies of bills so that Juan V.A. could "understand how much the insurance is paying and how much we are being charged." Five weeks later Lonski asked Juan V.A. for Explanations of Benefit ("EOBs"), but then said to disregard that request because he had been in contact with an insurance representative who would provide the information.

PSR ¶ 32:  GX 13 (Cigna's summary of phone calls with Lonski and various patients who complained about being billed for services not provided) in which Lonski blamed a "computer problem with his billing" and claimed that Juan V.A. and Margarite E. have been "uncooperative." *Id.*

PSR ¶ 35:  GX 14 (1/16/20 Letter from Cigna to Lonski) asking for "complete medical records" for Liam B. (from 9/27/17 to 12/28/18) and for Margarite E. (from 1/11/18 to 12/31/18).

PSR ¶ 36:  GX 15 (Lonski's 2/3/20 response to Cigna's request for records) claiming that he was the one who first notified Margarite E. of the billing issue (despite her raising the issue first in a text message), providing a purported letter from a programmer explaining how mistaken billings could have occurred, and providing 91 progress notes.

PSR ¶¶ 37:  GX 16 (Lonski Certification to Cigna) acknowledging that the "information is true, accurate and complete to the best of my knowledge and I understand that any falsification, omission, or concealment of material fact may subject me to administrative, civil,

or criminal liability."

PSR ¶¶ 38-39:  GX 17-18 (Lonski's Database of Progress Notes) showing that every one of the 91 progress notes Lonski sent to Cigna for Margarite E. and Liam B. were "added"/"created" only after Margarite E. sent a formal complaint to Cigna, in some cases years after the purported dates of treatment.

PSR ¶¶ 40: GX 13 (Cigna's summary of phone calls with Lonski and various patients who complained about being billed for services not provided) in which Lonski claimed to have "made corrections" to ensure that the "billing error" "didn't happen again."  GX 13 at CIGNA_000244 (2/11/20).  Cigna's summary also showed:

- Lonski failed to disclose that his office had been served with a federal search warrant the month before for the same overbilling issues Cigna was investigating, Lonski claimed he couldn't send the requested records because "his computer person" was in quarantine due to COVID-19 (*Id.* at CIGNA_245 (3/12/20));

- Lonski claimed he was diagnosed with COVID-19 and waiting to hear whether he "needs to be hospitalized" and so could not pull records (*Id.* at CIGNA_245 (3/26/20));

- The Cigna investigator called Lonski and the male who answered "whose voice was very similar to [Lonski's]" stated that he was the office manager "Mr. James" and that "Dr. Lonski" had been admitted to the ER and in ICU due to COVID-19.  *Id.* at CIGNA_245 (5/4/20).[2]

- Lonski produced records to Cigna (including the later-manufactured progress notes) on June 25, 2020.  *Id.* at CIGNA_245 (6/25/20).

Cigna's summary also revealed that Lonski submitted billings for several individuals who had no idea who he was:

- Patient/customer Elizabeth C. stated she had never heard of Lonski, Llewellyn or "Life Matters" (the organization Lonski represented as providing counseling to 9/11 families and first responders, PSR¶ 87). Elizabeth C. also stated that she had never had psychiatric evaluations,

---

[2] The government has Lonski's Medicare records for this time period and they do not reflect either visits to a physician or a hospitalization.

but had been in Greenwich Woods (where Lonski treated patients) Rehabilitation Center after back surgery. *Id.* at CIGNA_247 (3/5/20).

- Patient/customer Lenora C. stated that she had never heard of Lonski, but had femur surgery on the purported dates of service and had gone to Edgehill Rehab Center in Stamford (where Lonski treated patients). *Id.* at CIGNA_247 (3/5/20).

- Patient/customer Irene N. stated that she had never heard of Lonski, Llewellyn or "Life Matters," had never received psychiatric evaluations or psychotherapy, did not know how Lonski had obtained her insurance information, but had also been in rehabilitation in Greenwich following a knee and shoulder replacement. *Id.* at CIGNA_246 (3/5/20).

PSR ¶ 42:  GX 21 (Cigna's Report of Investigation) finding problems with Lonski's billing similar to the 2002 civil suit, and the "aberrancies" identified by the NE BISC, such as excessive services billed in a single day, excessive dates of service, "templating" of medical records with minor changes, and "very little therapy notes." GX 21 at CIGNA_000257.  Lonski's deceit in dealing with Cigna after he knew he was a target in a federal health care fraud case shows his resistance to any deterrence or course correction, whether he is investigated by the U.S. Attorney's Office, NE BISC/Medicare, or a private insurer.

**Billing for Excessive Hours, Including In Some Cases More Than 24 hours Per Day**

PSR ¶ 54:  GX 22 (List of "Impossible" Days) showing Lonski's billings from 1/1/14 to 2/5/20.  Lonski billed for over 24 hours of service in a single day for 60 dates; and for over 12 hours of service on 901 dates. GX 23 presents the same information in scattergram format.

Lonski also submitted claims on behalf of his wife, Evelyn Llewellyn, showing 170 dates on which Llewellyn claimed to have provided 12 or more hours of timed psychotherapy services in a single day, including two days that each reflected more than 24 hours of services.

**Billing on Excessive Service Days**

PSR ¶ 56:  GX 24 (Heat Map of Lonski Billings, 2014-2019), GX 25 (Lonski Saturdays

Billed), GX 26 (Lonski Sundays Billed), GX 27 (Lonski Holidays Billed), GX 28 (Heat Map of

Llewellyn Billings, 2014-2019).  Exhibit 24 is a "heat map" showing Lonski's submitted claims

for reimbursement for each day during a six-year period from January 1, 2014 through December

31, 2019.  Days with a higher number of claims submitted appear in a darker red color, and days

with a lower number claims appear in a lighter color.  Lonski claimed to have provided services

every single day during that six-year period, including weekends and holidays, except for a

single day, August 21, 2017 (a day that appears with a zero).  Exhibit 28 is the same type of heat

map for Llewellyn's submitted  claims.

Exhibit 25 is a list of Saturdays Lonski billed during this period (every single one) and

the number of patients he claimed to have seen on each day.  Lonski routinely claimed more than

15 patients in a single day, with multiple days claiming to have seen 30 or more patients, two

days purportedly having seen 41 patients (12/15/1 and 12/22/18); and one day purportedly

having seen 2 patients (11/24/18).  Similarly, Exhibit 26 is a list of Sundays Lonski billed during

this period (again, every single one) with multiple days claiming to have seen 30 or more

patients; three days billing for 42 patients in a single day (10/21/18; 10/28/18; 3/10/19); one day

claiming to have seen 49 patients (12/30/18); one day claiming to have seen 52 patients

(1/27/19); and one day claiming to have seen 54 patients (11/11/18).  Exhibit 27 is a list of

holidays on which Lonski purported to see patients, for example, billing for seeing 30 patients on

Christmas Day 2018 and 28 patients on Thanksgiving 2018.

## II.    LOSS CALCULATION

As the table below demonstrates (top row in white), from March 2014 to February 2020,

Lonski received approximately $5,528,481 in paid claims from insurers (representing about

80,000 in individual claims).  About $4,217,231 was for services purportedly provided by

Lonski, and about $1,311,250 was for services purportedly provided by Llewellyn.  At the time

Lonski communicated his intention to plead guilty, the government had analyzed a very

substantial number of individual claims, specifically $2,042,382 of Lonski's paid claims

(approximately 48% of total paid claims), and $1,061,809 of Llewellyn's paid claims

(approximately 81% of total paid claims). *See* light green row in chart below.

| | Lonski | Llewellyn | Total |
|---|---|---|---|
| Total paid by insurers (private, Medicare and Medicaid) | $4,217,231 | $1,311,250 | $5,528,481 |
| Total paid claims analyzed | 2,042,382 (48.4%) | 1,061,809 (81%) | 3,104,191 |
| Total fraud from paid claims analyzed (**TOTAL ACTUAL LOSS**) | 1,941,492 (95% fraud) | 709,804 (67% fraud) | **2,651,296** |
| Government program fraud (Medicare and Medicaid) | | | 1,276,385 |

The incidence of fraud found in those analyzed claims is staggering.  As noted in the

chart above, about 95% of the evaluated claims for Lonski's purported services were fraudulent,

and about 67% of the evaluated claims for Llewellyn's purported services were fraudulent (*see*

dark green row).  Out of 643 Lonski patients included in these claims, Lonski's billings reflected

fraudulent claims for all but six of them.  The total amount of actual loss associated with all of

these evaluated claims is **$2,651,296**, of which $1,276,385 (light tan row) represents government

program fraud (claims paid by Medicare or Medicaid).[3]

---

[3] The criminal loss amount here was calculated in a conservative manner that may understate the offense.  The loss amount of $2,651,296 is based upon the 22,000 claims specifically analyzed by the government and confirmed to be fraudulent.  The government did not analyze the remaining $2,424,290 of paid claims and did not include any of those claims in the loss calculation.  Given the high percentage of reviewed claims (48% of Lonski's and 81% of Llewellyn's), and the high rate of fraud (95% for Lonski, 67% for Llewellyn), it is reasonable to conclude that the unanalyzed claims may also involve fraud.  At the time Lonski communicated his intention to plead guilty, the government's fraud loss was already well into the $1,500,000 to $3,500,000 range.  Although the loss may have continued to increase had the government continued to analyze each claim, judicious use of government resources and Lonski's communication of his intention to plead guilty, dictated that Lonski receive the benefit of

### III.    PENALTIES

#### A.    Statutory Penalties and Guideline Calculations

Under 18 U.S.C. § 1347, the maximum penalty is 10 years of imprisonment, up to three

years of supervised release, a $250,000 fine – increased to twice the gross gain or loss pursuant

to 18 U.S.C. § 3571, and a mandatory special assessment of $100.

The PSR correctly calculated the applicable Guidelines as follows:

| | |
|---|---|
| Base Offense Level (§ 2B.1.1(a)(2)) | 6 |
| Loss more than $1,500,000 and less than $3,500,000 | |
| (§2B1.1(b)(1)(I)) | +16 |
| Government program fraud (§ 2B1.1(b)(7)) | +2 |
| Abuse of position of public/private trust (§ 3B1.3) | +2 |
| | 26 |
| | |
| Zero point offender (§ 4C1.1(a)) | -2 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)(b)) | -3 |
| Total Offense Level: | 21 |

At a Criminal History I, the defendant is subject to an advisory Guidelines imprisonment

range of 37 to 46 months. The defendant is also subject to a term of supervised release of one to

three years (PSR ¶112), and a fine range of $15,000 to $150,000. PSR ¶ 117.

#### B.    Restitution

Given the parties' plea agreement, the Court should enter restitution in the total amount

of $2,651,296. PSR ¶ 119.

### IV.    18 U.S.C. § 3553(a) Factors

#### A.    Nature and Circumstances of the Offense

The seriousness of the criminal offense must be considered first among the § 3553(a)

factors; indeed, it is the first goal of the criminal justice system listed in § 3553(a)(2).  Lonski's

---

expressing his intention to plead by having the government cease its analysis of submitted
claims.

scheme involved rampant fraud over the course of six years resulting in $5.5 million in paid claims, $2,651,296 of which is indisputably false.  Lonski alone determined on a daily basis precisely whose information he would use in submitting a claim, how much he wanted to claim, how many claims to submit, and for what.  For whatever Lonski now has to say about the feelings that may have motivated his prolonged fraud scheme, it is plainly obvious that he was motivated by greed and by wanting to keep money flowing into his bank account that he did not earn.  Isolating only the claims actually analyzed by the Government, Lonski submitted over 22,000 claims, submitting claims for every single day over six years, including weekends and holidays, except for one day, August 21, 2017.  Not only was Lonski's fraudulent conduct repeated, it was widespread, as 95% of the analyzed claims he submitted for his purported services were fraudulent.  Although Lonski later tried to justify some of those fraudulent claims by contending that patients who insisted they'd never heard of him were "confused" or "in decline," or out of their "right mind," at least one patient (Irene N.) wondered out loud just how Lonski obtained her information in the first place.  *See* PSR ¶¶ 18-27; *supra* at 7 (discussing Cigna patients Elizabeth C., Lenora C., and Irene N.).  Lonski's total commitment to this fraud scheme places his offense at the very serious end of the health care fraud scale.

### B.    History and Characteristics of the Defendant

Lonski spends much of his memorandum discussing his personal, work and family history as weighing in favor of leniency.  Def. Mem. at 13-22. To be sure, the defendant has shown compassion and commitment towards his patients, including 9/11 survivors and first responders.[4]  However, showing compassion towards people he counseled and supporting them

---

[4] It appears that Life Matters, the organization Lonski uses to highlight his work with first responders (PSR ¶ 87), was later used as a vehicle for false billings.  A fraud investigator at Cigna found Lonski had billed for services provided by "Life Matters" to patients who had never

through difficult personal circumstances was precisely what was expected of Lonski as a licensed psychotherapist. His work involved the very sort of encouragement that is frequently described in his letters of support and while admirable, was substantially performed in the normal course of his chosen profession. And, while some of his patients express gratitude for Lonski's talk therapy, the pattern of Lonski's billing makes clear that much of that work is inextricably linked with rampant fraud. Indeed, Lonski's concern for his patients is debased by his willingness to exploit them for his own unearned enrichment.

For example, a patient of Lonski's, Tara S., submitted a letter of support for Lonski at DX 21. The patient described difficulties she had with her daughter and husband, Douglas G., and how Lonski helped her to manage. DX 21 at 2. For whatever help Lonski provided to Tara S., he was also billing furiously for individual services purportedly provided to Tara S.'s husband, Douglas G. GX 29 is a summary of payments for services Lonski billed for both Tara S. and Douglas G. From 2014 through 2019, Lonski submitted 642 claims for Tara S. and received $163,422 from Anthem. During the same period, Lonski submitted 603 claims for Douglas G. and received $161,241 from Anthem for those claims. In 2019, Lonski billed substantially more for Douglas G. (222 claim lines) than for Tara S. herself (161 claim lines). The Government found evidence that Douglas G. may have accompanied Tara S. on two occasions to counseling – visits that would properly be billed as family psychotherapy. But Lonski's text messages with Douglas G. show that their relationship was based upon some sort of website project Douglas G. was working on, not psychotherapy counseling. GX 30. Lonski's

---

heard of the organization, Michael Lonski or Evelyn Llewellyn. GX 13 at CIGNA_246-247 (Patients Irene N., Elizabeth C.).

submission of 603 claims for treating Douglas G., while profitable for Lonski, seems at odds with "exemplary" treatment of Tara S.

Similarly, Christina T. submitted a letter in support of Lonski at DX 46. The Government evaluated four of Lonski's submitted claims for Christina T., and all four of them were fraudulent in that they were submitted for date of service when Lonski was in Paris (9/26/16 and 9/29/16), and when Lonski and his family were in Chicago (6/3/16 and 6/6/16). GX 32. Despite Lonski's insistence that his patient care has always been "exemplary," his progress notes for Christina T., as with other patients whose progress notes are included in this submission, highlight his disregard for documentation essential to quality care. GX 31 lists the extent of Lonski's progress notes for Christina T., with most of them simply listing either her first or last name, or "Christina migraine." *Id.* The most detailed note says simply "grief over miscarriage." *Id.* Progress notes provide an important record for the clinician of a patient's care. It is hard to see how Lonski was tracking Christina T.'s treatment when he had no record of events, no ability to compare her current status to previous visits, no opinions, no plans, and nothing to allow a later provider to understand her treatment.

Lonski describes a challenging family history of physical and emotional abuse, and suggests that the fraud here arose out of chaotic behavior and fits of manic energy due to undiagnosed mental illness. Def. Memo. at 1, 20. However, Lonski's billing patterns and history are inconsistent with that claim. Lonski billed for every single day, Saturdays, Sundays, holidays for six years, except for one single day in August of 2017. That conduct demonstrates a steadfast, intentional and consistent devotion to his chosen scheme, not tumultuous, manic behavior borne out of chaos. Just as his patients describe him as "exuding a sense of calm," Lonski demonstrated a steady hand in submitting false billings consistently, year after year, regardless of whatever else may have been going on in his life or state of mental health.

Further, it is not as if federal investigators in this case simply caught Lonski on a bad (chaotic) day.  He has been investigated by multiple entities dating back over **20 years**, and has returned to fraudulent billing after each and every instance, including after the search warrant in this case when he claims (wrongly) to have stopped his fraud.  He was sued in September 2002, in the Southern District of New York for precisely the same aberrancies as in this case, namely, seeing excessive numbers of patients on a given day, for multiple visits by a given patient on the same day, for excessively high number of visits per patient and for services rendered on excessive numbers of days in a given year.  GX 1 at 7.  Lonski agreed to pay $4,000,000 in restitution to the United States – a loss amount that, like here, must have involved tens of thousands of submitted claims.  PSR ¶ 7.  Most notably, in order to settle that case, Lonski voluntarily agreed to be excluded from participation in "Medicare, Medicaid, and all Federal health care programs . . . for a period of five (5) years."  GX 2 at 10.  This meant that Lonski could not receive reimbursement for any services furnished, ordered or prescribed by him in any capacity or through any entity he controlled and would be subject to criminal prosecution if he submitted claims or caused claims to be submitted for services rendered while excluded.  *Id.*

If anything should have served as a wake-up call, one would expect that being barred from the Medicare and Medicaid programs and unable to earn a living submitting any claims to those federal health care programs would do so.  But the investigation by the USAO-SDNY did nothing to deter Lonski.  After serving his exclusion Lonski was readmitted to the Medicare program, enrolled as a Medicaid provider, and given his first second chance.  But by 2013, he was again under investigation for "aberrancies in billing" of Medicare claims.  PSR ¶ 8, 13, GX 2, 3.  The New England Benefit Integrity Support Center (NE BISC), an entity responsible for reviewing Medicare claims, evaluated Lonski's claims for a 7-week period in 2013.  *Id.*  Finding a strikingly similar fraud rate to the claims in this case, NE BISC denied 94% of Lonski's claims

because of the same problems subject of the 2002 Complaint, namely, excessive number of days billed, excessive visits per day, progress notes that were either missing entirely, "cloned," or inadequate in that they described visits that were "supportive in nature" rather than "being of medical necessity." PSR ¶ 14.

The investigation of his Medicare claims by the NE BISC did nothing to deter Lonski from his continued course of fraud. Instead, in February 2015, the National Government Services, Screening Investigation Unit (NGS-SIU) initiated another investigation of Lonski's Medicare claims because of patient complaints. PSR ¶¶ 18-27.

Patient Raymond L. contacted Lonski in April of 2014 to complain about four claims for services not rendered and Lonski told him that it would be corrected. PSR ¶ 18, GX 4. When it was not fixed, Raymond L. complained, and NGS-SIU notified Lonski on February 25, 2015 that it was initiating an audit of those claims. PSR ¶ 19, GX 5. Lonski responded by claiming that skilled nursing patients (including Raymond L.) often refer to him as "Dr. Mike" and don't realize that he is Dr. Lonski as listed on their Explanation of Benefits. PSR ¶ 20, GX 6 at MEDICARE_30. The import of Lonski's explanation was clear, namely, that older patients covered by Medicare (like Raymond L.) are often confused, and so the NGS-SIU should believe Lonski, not Raymond L. To backup this claim, on March 28, 2015, Lonski submitted a progress note that included a reference to "Dr. Mike," stating: " . . . this clinician whom patient knows as Dr. Mike. Never thought to ask last name as all residents refer to clinician this way patient states." PSR ¶ 21, GX 6 at MEDICARE_59. But this progress note was bogus.

GX 7 is a printout of information from Lonski's database seized during the search warrant in this case showing the history of progress notes for the four disputed dates of service for Raymond L. Lonski revised progress notes for Raymond L.'s purported treatment in January

of 2014 to include more detail and inserting the part about "Dr. Mike" to corroborate his story, and then submitted those newly created progress notes to NGS-SIU six days later.  GX 6, 7.

Similarly, the wife of Medicare patient Robert F. complained to NGS-SIU that Lonski had billed for psychotherapy for Robert F. that was not received.  PSR ¶ 23, GX 8.  After he received a request for verification of service on June 22, 2015 (GX 9), Lonski created a new progress note for Robert F. claiming that Robert F. suffered from "confusion," "memory loss," and in a "current decline in functioning," and twice stating that, due to these reasons, the patient "does not recall seeing clinician."  GX 10.  It seems particularly offensive that someone who touts himself as specializing in the counseling of elderly patients would resort to blaming their advanced age when they questioned his fraud.

Lonski also manufactured bogus progress notes in the face of scrutiny by investigators for private insurers.  Lonski's patient Margarite E. and her husband Juan asked for documentation for Lonski's treatment of Margarite E. and their son, Liam B.  Lonski put the couple off for weeks without providing the requested bills.  PSR ¶¶ 29-31; GX 12 at CIGNA 47. When the patients lodged a formal complaint with Cigna, Lonski engaged in a tortured path of deception.  Lonski falsely claimed that Margarite E. and her husband were "uncooperative," that they had "harassed" him for payment, that the billing issue was because of a "glitch" in his electronic billing system, and that he had made "corrections" to make sure it didn't happen again.  PSR ¶ 32; GX 13.  After repeated texts to Margarite E. went unanswered, Lonski asked to speak with her "by phone" "as a courtesy."  GX 11 at SW_37.  On April 23, 2019, Margarite E. informed Lonski that "[u]nder advice of our counsel, I am to keep our exchanges in writing."  *Id.* Now on the defensive, Lonski tried to gaslight Margarite E., saying:

> Obviously it was caused by a technical problem with the program that I use.  Nobody in their right mind [would] bill somebody for that many sessions especially on one day.

GX 11 at SW_38.  Although he well knew his billings were false, Lonski nonetheless suggests to Margarite E. that she would not be "in her right mind" to think that he did such a thing intentionally.  It hardly seems like "exemplary" care to make a patient receiving psychotherapy question her own conclusion that Lonski was engaging in fraud when he knew that he really was.

As things were clearly going south with Margarite E., and knowing that he would have to produce proof to justify his billings to Cigna, Lonski went to work manufacturing progress notes.[5]  In between June 10, 2019 and June 30, 2019, Lonski manufactured 91 progress notes for Liam B. and Margarite E. (GX 17, 18).

Lonski insists that "this was not a fraud committed by a man hoping to get away with it," that he really wanted to be caught, and that in response to execution of the federal search warrant of his home "he mostly felt relief" because "[h]e could stop now."  Def. Memo. at 21.  But Lonski was hoping to get away with it every time he manufactured progress notes, every time he lied to his patients, and every time he lied to investigators who were looking into his billing practices.  And he could not have felt the sort of "relief" described in response to the federal search warrant because those deceptive practices continued for months afterwards.

After the February 12, 2020 search warrant, Lonski continued to deceive the Cigna investigator, just as he had been doing to investigators for the previous 20 years.  Lonski gave the investigator the runaround, blaming his "computer person" for not being able to retrieve records, claiming to have been diagnosed with COVID-19, claiming to be the office manager

---

[5] Although Lonski was unable to prevent Margarite E. from reporting him to her insurer, Lonski headed other patients off before it got that far.  Just as he did with Margarite E., when patient Irina raised the issue of wanting to talk to Lonski about insurance, Lonski lied.  GX 33.  He said that "my billing person made a mistake that I just caught" (when, of course, there was no billing person and no "mistake").  Lonski then attempted to ensure that he controlled dealings with Irina's insurer, asking her to let him know if they contacted her or sent her anything.  *Id.*

"Mr. James" and saying that "Dr. Lonski" had been "admitted to the ER and in ICU due to Covid19," a hospitalization and treatment not reflected in Lonski's own Medicare records. GX 13 at CIGNA 244-245. On June 25, 2020, over four months after the search warrant was executed, Lonski produced records to Cigna concerning Margarite E. and Liam B., including the bogus progress notes he created after-the-fact. GX 12 at CIGNA 51-216. Lonski never wanted to be caught for his fraud on Cigna (or anyone else); he just didn't know at the time that he already had been.

### C.     A sentence within the Guidelines range is necessary to reflect the seriousness of Lonski's offense, to provide just punishment, and to provide adequate deterrence to criminal conduct

Health care fraud is a crime that causes billions of dollars in losses to Government and private health insurance programs each year. *Sepe United States v. Lucien*, 347 F.3d 45, 48 (2d Cir. 2003); *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) ("Insurance companies must rely on the honesty and integrity of medical practitioners in making diagnoses and billing for their services. And . . . deterrence is an important factor in the sentencing calculus because health care fraud is so rampant that the government lacks the resources to reach it all. Thus, when the government obtains a conviction in a health care fraud prosecution, one of the primary objectives of the sentence is to send a message to other health care providers that billing fraud is a serious crime that carries with it a correspondingly serious punishment"); *United States v. Thurston*, 358 F.3d 51, 81 (1st Cir.2004) ("Health care fraud is a serious crime and the federal interest in combating it is powerful.... Every dollar lost to fraud is a dollar that could have provided medical care to the elderly or the disabled.") (*reversed on other grounds by Thurston v. United States*, 552 U.S. 1092 (2008)).

Lonski exploited both the nature of the Medicare and Medicaid programs and the particular vulnerabilities of its patients. To ensure critical medical care for some of

Connecticut's neediest citizens, in particular elderly and lower income patients, Medicare/Medicaid favors prompt payment of claims and maintaining a robust roster of providers. This necessarily means, however, that false claims will sometimes be paid out and that some unscrupulous financial predators are allowed into the program, leaving Medicare/Medicaid investigators to chase money after it's been paid. Lonski knew this structure better than anyone. He exploited patients who, as a whole, were unlikely to scrutinize their EOBs, and a program that necessarily relies on chasing money on the back end in favor of prompt delivery of needed medical care. As this case amply demonstrates, it is extraordinarily difficult for program integrity investigators to catch a fraudulent provider who is willing to demean patients behind their backs and manufacture bogus progress notes to justify false billings. Imposing significant sentences upon those who steal from Medicare/Medicaid signals that ensuring that the neediest among us have access to health care is highly valued, and worthy of vigilant defense, and provides necessary reinforcement to the anti-fraud efforts of the program itself.

Lonski argues that he has already suffered enough because he relinquished his license, separated from his wife, suffers from an estranged relationship with his daughter/grandchildren, and has lost the trust and respect of his community. Def. Memo. at 30. But those precise collateral consequences are common to many white collar offenders and the fact that Lonski has experienced them does not reduce the need for punishment here. Given the deceit Lonski used to avoid detection, the magnitude and longevity of his scheme, and his long history of defrauding Medicare, Lonski distinguishes himself as someone particularly worthy of substantial punishment. Lonski was not suffering any financial distress when he undertook this decades-long fraud scheme; to the contrary, he enjoyed a financial largess that most can only dream about. He lived in a historic home in a tony neighborhood in Old Greenwich and vacationed

around the world in Paris, Bermuda, Iceland, London, and Ireland.  He has shown a remarkable

lack of respect for the law.  Even after multiple second chances, he continued to blame and

gaslight his patients and manufacture false documents in order to continue getting away with it.

The Guideline range in this case, including specific adjustments for severely harming a

Government health care program and violating a position of trust, reflects the value society

places on programs like Medicare, and provides an appropriate sanction that is sufficient, but not

greater than necessary, to reflect the seriousness of Lonski's offense.

<div style="margin-left: 3em;">

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

*/s/ Susan L. Wines*
SUSAN L. WINES
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv2379
157 Church Street, 23rd Floor
New Haven, Connecticut  06510
Tel: (203) 821-3700
Susan.wines@usdoj.gov

</div>

***United States v. Michael Lonski***
**Case No. 3:22-cr-227 (SVN)**
**Exhibit List - Government's Sentencing Memorandum**

| <u>GX</u> | <u>Description</u> |
|---|---|
| 1 | Lonski 2002 SDNY Complaint |
| 2 | Letter dated 7.26.2013 from Centers for Medicare & Medicaid Services to Lonski re Prepayment Notification |
| 3 | Letter dated 12.20.13 from Centers for Medicare & Medicaid Services to Lonski re findings of pre-pay review |
| 4 | Complaint dated 1.26.15 re Raymond L. |
| 5 | Letter dated 2.25.15 from National Government Services to Lonski requesting medical docs |
| 6 | Lonski response dated 3.28.15 to National Government Services re request |
| 7 | Lonski Database progress notes for Raymond L. |
| 8 | Complaint dated 2.13.15 re. R. Ferry |
| 9 | Resolution of R. Ferry complaint |
| 10 | Lonski Database progress notes for Robert F. |
| 11 | Text messages between Lonski, Liam B., Marie E. |
| 12 | Lonski email dated 2.4.20 to CIGNA with attachments re Medical Records Request |
| 13 | CIGNA summary of phone calls and emails with Lonski |
| 14 | CIGNA email dated 1.16.20 to Lonski with attachments re Medical Records Request |
| 15 | Lonski email dated 2.3.20 to CIGNA attaching documents re records request |
| 16 | Lonski email dated 2.3.20 to CIGNA attaching signed Certificate of True Copy |
| 17 | Lonski Database progress notes for Maria E. |
| 18 | Lonski Database progress notes for Liam B. |
| 19 | 02cv88690 Fully Executed Settlement Agreement |
| 20 | CIGNA letter to Lonski dated 2.12.20 re medical records request |
| 21 | CIGNA report of investigation dated 7.23.20 |
| 22 | Chart - Lonski Impossible Days |
| 23 | Chart - Lonski Hours Billed Chart |
| 24 | Heat Map - Lonski Claims 2014 through 2019 |
| 25 | Chart - Lonski Saturdays Billed 2014-2019 |
| 26 | Chart - Lonski Sundays Billed 2014-2019 |

| __GX__ | __Description__ |
|---|---|
| 27 | Chart - Lonski Holidays Billed |
| 28 | Heat Map - Llewellyn Claims 2014 through 2019 |
| 29 | Chart - Anthem Payments to Lonski for Tara S., Douglas G. |
| 30 | Lonski texts with Douglas G. |
| 31 | Lonski Database progress notes for Christina T. |
| 32 | Lonski false UHC claims for Christina T. |
| 33 | Lonski texts with patient "Irina" |

<u>CERTIFICATION</u>

I hereby certify that on December 11, 2023, a copy of the foregoing was filed electronically with the court.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Susan L. Wines*

_____
SUSAN L. WINES
ASSISTANT UNITED STATES ATTORNEY